# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RORY D. WHITE,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | |
| | | **CIVIL NO. JKB-18-3232** |
| **CITY OF HAGERSTOWN, *et al.*,** | * | |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Rory D. White sued the City of Hagerstown and Hagerstown Police Officers Zach McKoy, Alec Routhier, Mitchell Filges, John Doe 1, and John Doe 2 (collectively, "Defendants") alleging that the officers unlawfully seized him and subjected him to excessive force in violation of 42 U.S.C. § 1983.  Defendants moved "to dismiss or for summary judgment, or, in the alternative, to bifurcate count 3 (*Monell* claim) and stay discovery" (ECF No. 16), and that motion is currently pending.  Also pending are White's motion for leave to file a sur-reply (ECF No. 24), and Defendants' motion to supplement their dispositive motion (ECF No. 27).  All the motions are fully briefed and no hearing is required.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons set forth below, the Court will deny White's motion for leave to file a sur-reply and grant Defendants' motion to supplement.  White's claims against Officers Filges and Routhier will be dismissed on statute of limitations grounds.  Summary judgment will be granted to Officer McKoy and denied to the City of Hagerstown.  The request for bifurcation will be denied as moot.

### I.      Background

This lawsuit arises out of the Defendant officers' seizure of Mr. White on the evening of October 17, 2015.  Though certain details are contested, the events at issue are largely agreed upon

by the parties.   At approximately 7:30 p.m., Mr. White's wife, Nyisha White,[1] called 911 requesting assistance in relation to a domestic dispute at the Whites' home at 1061A Noland Drive in Hagerstown.  (Am. Compl. ¶ 12, ECF No. 5; CAD Printout, Mot. to Dismiss Ex. 2, ECF No. 16-4.)  Officer McKoy was the first officer to arrive at the scene, where he found Mr. and Mrs. White, as well as Mrs. White's children and a friend of her daughter.  (Am. Compl. ¶ 16; McKoy Incident Report, Mot. to Dismiss Ex. 3, ECF No. 16-5.)  Officer McKoy spoke with Mrs. White outside her husband's presence, and she reported he "had been acting strange and talking out of his head . . . saying things like, 'This is it, the world is going to end today,' and 'someone is going to die, everyone is going to die.'"  (McKoy Incident Report.)  Mrs. White also stated that her husband "is a PCP [phencyclidine] user, and she believed he was currently under the influence of PCP."  (*Id.*; White Aff. ¶ 5, Opp'n Mot. to Dismiss Ex. 1, ECF No. 19-2.)  Though Mrs. White did not accuse her husband of any specific violent or criminal acts, she "stated she wanted him removed from the house because she felt that he was a danger to the children and she was scared." (McKoy Incident Report.)

After speaking with Mrs. White, Officer McKoy was joined by Officer Routhier, and both officers went to speak with Mr. White.  (*Id.*; Routhier Aff. ¶¶ 3–5, Mot. to Dismiss Ex. 4, ECF No. 16-6.)  There is some dispute regarding this interaction, though all parties agree that Mr. White denied any drug use, claimed that his wife was the one acting "crazy," and urged the officers to take her into custody rather than him.  (White Aff. ¶¶ 10, 25; McKoy Incident Report.)  In their sworn statements, both police officers testify that Mr. White appeared to be "sweating profusely," highly agitated, unable to focus or respond to questions, and otherwise acting in a concerning

---

[1] The Court notes that though in Mr. White's affidavit, he refers to his wife as "Nyisha," the Amended Complaint refers to her as "Neisha," and White's briefing refers to her as both "Nyisha" and "Niesha."  The Court will adopt the spelling used in Mr. White's sworn statement.

manner consistent with his wife's narrative and PCP use.  (McKoy Incident Report; Routhier Aff. ¶¶ 5–7.)  Officer Routhier states that, consistent with Mrs. White's report, Mr. White "yelled about the end of the world and that everyone is going to die."  (Routhier Aff. ¶ 7.)  Officer McKoy specifically recalls Mr. White saying, "do you believe in god because this is the end, tonight is the end of the world."  (McKoy Incident Report.)  In his own affidavit, Mr. White contests that he "was not sweating profusely, feeling numb" or otherwise experiencing other symptoms associated with PCP use.  (White Aff. ¶ 24.)  However, Mr. White does note that having police officers enter his home and question him made him increasingly fearful, as he began to sense that he might be taken into custody or harmed.  (*Id.* ¶¶ 26–27.)  Mr. White's affidavit does not contest that he made the statements regarding the imminent end of the world reported by the officers.[2]

At some point, the officers called for Emergency Medical Technician ("EMT") assistance, and an EMT team soon arrived at the house with an ambulance.  (Gargana Aff. ¶¶ 3–7, Mot. to Dismiss Ex. 5, ECF No. 16-7.)  EMT Jennifer Gargana testifies that when they arrived, "Mr. White was yelling something about the world ending, was fidgety, and was sweating profusely."  (*Id.* ¶ 5.)  EMT Casey McKnight similarly testifies that he observed Mr. White "yelling things like 'we're all gonna die.'"  (McKnight Aff. ¶ 5, Mot. to Dismiss Ex. 6, ECF No. 16-8.)  Again, Mr. White does not deny making these statements, though he does contest other aspects of the EMTs' testimony in his affidavit.  Mr. White refused to allow the EMTs to examine him or follow the EMTs to the waiting ambulance, insisting that he had not used PCP and did not require medical attention.  (White Aff. ¶¶ 26–29; McKoy Incident Report.)  He remained seated in a chair.  (*Id.*)

After trying to convince Mr. White to follow the EMTs, Officers McKoy and Routhier attempted to physically seize Mr. White from his chair and bring him to the ambulance.  (McKoy

---

[2] Further, in his opposition brief and proposed sur-reply brief, White implicitly concedes that he did indeed make these statements.  (*See* Opp'n Mot. to Dismiss at 23, ECF No. 19; Proposed Sur-Reply at 4, ECF No. 24-2.)

Incident Report; Routhier Aff. ¶¶ 7–9; White Aff. ¶¶ 29–31.)  In his Incident Report, Officer McKoy notes that by this point, he was concerned that Mr. White "was a danger to himself and everyone in the house." (McKoy Incident Report.)  Mr. White resisted the officers' efforts to pull him from the chair and bring his arms behind his back, and the officers then pulled Mr. White to the floor by his arms and pants. (McKoy Incident Report; Routhier Aff. ¶¶ 7–9; White Aff. ¶¶ 29–31.) As a result of the officers' pulling, Mr. White's pants came off, and Mr. White brought both hands underneath his body to protect himself. (White Aff. ¶¶ 30–33.) As Mr. White lay on his stomach, Officers McKoy and Routhier continued to attempt to pull his arms behind his back, but Mr. White was able to resist their efforts. (*Id.*)

More officers then arrived on the scene, including Officer Filges. (Filges Incident Report, Mot. to Dismiss Ex. 7, ECF No. 16-9.) In an effort to force Mr. White to give up his hands, Officer Filges tasered him in the back twice, causing Mr. White significant pain. (*Id.*; White Aff. ¶¶ 34–39.) There is no evidence that Mr. White was actively threatening the police officers at the time he was tasered, or doing anything besides keeping his hands held under his body. Following the second taser use, the officers were able to pull Mr. White's arms behind his back, handcuff him, then take him to the waiting ambulance. (White Aff. ¶ 39.) The taser barbs were left in Mr. White's back and continued to cause him pain. (*Id.*)

The officers and EMTs then brought Mr. White to the Emergency Department of Meritus Medical Center, where he was admitted based on a petition for emergency evaluation submitted by Officer McKoy pursuant to Md. Code Ann., Health-Gen § 10-622. (Am. Compl. ¶¶ 45–47; Petition for Emergency Evaluation, Compl. Ex. 1, ECF No. 1-2.) In the petition, Officer McKoy responded to a prompt regarding his reason for believing White presented a danger to himself or others by noting: "He was talking outside of his head saying things like 'Everyone is going to die

tonight, It's the end of time.  You guys are going to try to kill me."  (*Id*.)  Following his arrival at Meritus Medical Center, Mr. White screamed for help and was sedated.  (White Aff. ¶ 42; Am. Compl. ¶ 109.)  The treatment providers at Meritus Medical Center then administered a drug test, and Mr. White tested negative for any drugs or alcohol.  (White Aff. ¶¶ 45–49.)  Mr. White was given a psychiatric evaluation the next morning and was then discharged from the hospital.  (*Id.*)  No criminal charges were filed in relation to the incident.  (*Id.* ¶ 50.)

Subsequently, on April 4, 2016, White provided the City of Hagerstown ("the City") with notice of a "pending claim against the Hagerstown City Police Department" in relation to this incident pursuant to Md. Code Ann. Cts. & Jud. Proc. § 5-304.  (Am. Compl. ¶ 109.)  White then waited until October 17, 2018—the last day of the three-year statute of limitations period—before filing the Complaint and initiating this lawsuit.  (Compl., ECF No. 1.)  In the Complaint, White named as Defendants the City of Hagerstown, "Officer McKay #5086," and four unnamed "John Doe" Officers.  (*Id*.)  He claimed that the officers had committed an unlawful seizure and used excessive force in violation of 42 U.S.C. § 1983 and sued each officer in both his official and individual capacity.  (*Id.*)  White also claimed that the City was liable for its officers' excessive use of a taser and attached official policies allegedly establishing the City's culpability.  (*Id.*)

The next day, October 18, 2018, White submitted proposed summonses.  (ECF No. 3.)  The summonses issued on March 18, 2019.  (ECF No. 4.)  White and his counsel do not appear to have taken any steps to inquire regarding the status of the summonses or effect service prior to March 18, 2019.  Nor did White or counsel take any steps to effect service after the summonses were issued.  Instead, on April 8, 2019, White filed an Amended Complaint correcting Officer McKoy's name, substituting Officers Routhier and Filges in the place of two of the original Complaint's "John Doe" officers, and adding allegations related to those officers' roles in events.  (ECF No.

5.)  Summonses for the Amended Complaint issued the next day.  (ECF No. 7.)  Again though, White and his counsel made no effort to serve any Defendant.

On August 9, 2019, the Court ordered White to show cause why the case should not be dismissed for failure to prosecute, given his failure to complete service or request an extension during the period established by Federal Rule of Civil Procedure 4(m).  (ECF No. 8.)  White's counsel responded with a letter stating that the failure was the result of an administrative error on counsel's part, and the Court ordered Mr. White to file proof of service or a waiver of service within 30 days.  (ECF Nos. 9, 10.)  On August 23, 2019, counsel for the City and Officers McKoy, Filges, and Routhier waived service.  (ECF Nos. 13, 14.)

Subsequently, on September 9, 2019, Defendants filed their pending "motion to dismiss or for summary judgment, or, in the alternative, to bifurcate count 3 (*Monell* claim) and stay discovery."  (ECF No. 16.)  Defendants principally argued that the individual officers are entitled to qualified immunity and that the city is entitled to summary judgment because White failed to establish municipal liability.  Defendants attached to their motion the affidavits of each named officer and two EMTs.  White opposed the motion, relying exclusively on his own affidavit.  (ECF No. 19) and Defendants filed a reply (ECF No. 20).  White then filed a sur-reply (ECF No. 21), withdrew it after Defendants moved to strike (ECF No. 22), then moved for leave to re-file the sur-reply (ECF No. 24).  Next, Defendants filed a motion to supplement their dispositive motion, seeking to add a new argument that the claims against Officers Routhier and Filges should be dismissed on statute of limitations grounds.  (ECF No. 27.)  White consented to the motion to supplement but contested the merits of the statute of limitations argument.  (ECF No. 28.)

## II.      Legal Standard

Defendants style their motion as a motion to dismiss or for summary judgment, and both Defendants and White rely on exhibits outside of the pleadings in their briefing.  Under Federal Rule of Civil Procedure 12(d), a Court faced with a motion styled in this manner has discretion to treat the motion as a motion for summary judgment, subject to a plaintiff's objection.  *See Costley v. City of Westminster*, Civ. No. GLR-16-1447, 2017 WL 35437, at *3–4 (D. Md. Jan. 4, 2017), *aff'd sub nom. Costley v. Steiner*, 689 F. App'x 753 (4th Cir. 2017).  White has not objected to pre-discovery summary judgment or filed an affidavit pursuant to Rule 56(d) seeking the opportunity to engage in discovery prior to a decision.  *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (The nonmovant "cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.") (quoting *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  As such, the Court will treat the motion as one for summary judgment.

Federal Rule of Civil Procedure 56(a) establishes that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Court must "view the evidence in the light most favorable to[] the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  Therefore "[a] party opposing a

properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249–50.

### III.    *Analysis*

Preliminarily, the Court denies White's motion for leave to file a sur-reply. Although the Court has discretion to permit sur-replies under Local Rule 105.2(a), they "are generally disfavored" outside of rare instances in which a movant raises new arguments in a reply brief. *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013), *aff'd in part sub nom. E.E.O.C. v. Freeman*, 778 F.3d 463 (4th Cir. 2015). White has not identified any arguments newly raised on reply or any other unusual circumstances justifying a sur-reply. As such, the motion is denied.[3]

Second, the Court grants Defendants' motion for leave to supplement their dispositive motion by adding the argument that the claims against Officers Filges and Routhier should be dismissed on statute of limitations grounds. (ECF No. 27.) Defendants point out that addressing this affirmative defense now will serve the interests of judicial economy, and White has consented to the motion to supplement. (*See* Opp'n. Mot. to Supplement at 2, ECF No. 28.) The Court agrees that addressing statute of limitations issues at this phase is most efficient, and accordingly will consider the statute of limitations defense along with the other arguments raised by Defendants.

Moving to the substance of the arguments, the Court will first address Defendants' statute of limitations defense regarding the claims against Officers Filges and Routhier. The Court will

---

[3] However, to the extent that the purpose of the sur-reply is to remedy alleged deficiencies in Mr. White's attestation to his affidavit, the Court finds that the affidavit conforms with the requirements of Local Rule 601.3 (D. Md. 2018).

next turn to Defendants' argument that Officer McKoy is entitled to summary judgment on qualified immunity grounds, then to their argument regarding the City's liability.

### A. Statute of Limitations Argument as to Officers Filges and Routhier

Summary judgment will be granted to Officers Filges and Routhier.  Though it is the policy of the Fourth Circuit and the preference of this Court that disputes be decided on their merits whenever the law permits, the statute of limitations and relevant precedent preclude White from proceeding against Officers Filges and Routhier.

Because Section 1983 does not include a statute of limitations, "courts borrow the statute of limitations from the most analogous state-law cause of action." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 388 (4th Cir. 2014).  In Maryland, the applicable limitations period is three years.  *See id.* (citing Md. Code Ann., Cts. & Jud. Proc. § 5-101).  Here, it is uncontested that White's Section 1983 claims accrued on October 17, 2015, when all the alleged violations occurred.  White did not name Officers Filges and Routhier in his timely October 17, 2018 Complaint.  Instead, he named those Defendants in the Amended Complaint filed on April 8, 2019—nearly six months after the three-year statute of limitations had expired.  Therefore, on their face, the claims against these Defendants are untimely.

However, White argues that under Federal Rule of Civil Procedure 15(c)(1)(C), his claims against Officers Filges and Routhier "relate back" to the timely original Complaint.  Rule 15(c)(1)(C) provides:

> [A]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment changes the party or the naming of the party against whom a claim is asserted . . . if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits;

and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

White contends that Rule 15(c)(1)(C) permits relation back here because: (1) White included placeholder "Officer John Doe" Defendants in the original Complaint and is merely "correcting" the names of those Defendants by substituting in Officers Filges and Routhier; (2) Officers Filges and Routhier were effectively notified of this lawsuit in April of 2016 when White gave notice of his potential claims to the City; and (3) Officers Filges and Routhier are represented by the same counsel as Officer McKoy and the City, and therefore received notice of White's claims at the same time as those Defendants did.

Both Circuit precedent regarding "John Doe" substitutions and the specific facts of this case weigh heavily against White. In *Locklear v. Bergman & Beving AB*, the Fourth Circuit recognized "the weight of federal case law holding that substitution of named parties for 'John Doe' defendants does not constitute a mistake pursuant to Rule 15[.]" 457 F.3d 363, 367 (4th Cir. 2006). Then, sitting *en banc* in *Goodman v. Praxair, Inc.*, the Fourth Circuit reiterated this view regarding "John Doe" substitutions even as it emphasized that the issue of the defendant's notice sits at the core of the 15(c)(1)(C) inquiry. 494 F.3d 458 (4th Cir. 2007). The Fourth Circuit expressly stated that "while parsing among different kinds of mistakes does not typically aid application of [Rule 15], naming Doe defendants self-evidently is no 'mistake[.]'" *Id*. at 471. This authority is not readily distinguishable. Though some courts have found that the Supreme Court's decision in *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538 (2010) indicates that Rule 15(c)(1)(C) allows "John Doe" substitutions to relate back, the Fourth Circuit has not endorsed this reading and multiple circuit courts have explicitly rejected it. *See, e.g.*, *Heglund v. Aitkin City*, 871 F.3d 572 (8th Cir. 2017); *Hogan v. Fischer*, 738 F.3d 509 (2d Cir. 2013).

10

Further, this is not a case in which the plaintiff's diligence in providing notice to the "John Doe" defendant within the presumptive Rule 4(m) 90-day period for the completion of service might support an exception.  As noted above, White did not provide notice of this lawsuit to Defendants Filges and Routhier until August 23, 2019—more than 300 days after the expiration of the statute of limitations period.  And though White did inform the City that he was considering legal action in April of 2016, this notice to the City of a potential lawsuit cannot be construed as "notice of the action" to Officers Filges and Routhier under 15(c)(1)(C).  *See Thompson v. Dollar Tree Stores, Inc.*, Civ. No. PWG-17-3727, 2019 WL 414881, at *4 (D. Md. Feb. 1, 2019) (explaining "notice of a possible claim does not provide notice of the actual litigation"); *Williams v. Dix*, Civ. No. ELH-17-2381, 2018 WL 6831165, at *4 (D. Md. Dec. 27, 2018) (rejecting argument that similar letter established notice to John Doe officers).

The Court recognizes the apparent tension between the Court's decision to excuse White's delay in serving the Defendants named in the original Complaint and the Court's finding that it cannot excuse the delay in identifying and serving Officers Filges and Routhier.  But under the above-discussed law, allowing the John Doe substitution would simply be a bridge too far—beyond the bounds of the Court's discretion.  Accordingly, summary judgment will be granted.

### B.  Claims Against Officer McKoy

Summary judgment will also be granted to Officer McKoy.  Preliminarily, White's official capacity claims against Officer McKoy will be dismissed as duplicative of his *Monell* claim against the City.  An official capacity claim against an agent of a government entity is "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Where, as here, a plaintiff has both sued the agent in his official capacity and directly sued the responsible entity, an official capacity claim against the agent "should be dismissed as

duplicative." *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004); *see also Grim v. Baltimore Police Dep't*, Civ. No. ELH-18-3864, 2019 WL 5865561, at *16 (D. Md. Nov. 8, 2019) (dismissing official capacity claim as "redundant" where plaintiff sued responsible entity as well).

Moving to the individual capacity claims, the Court will grant summary judgment to Officer McKoy on the grounds that he is entitled to qualified immunity on both the unlawful seizure and excessive force claims. Qualified immunity protects a government official from civil liability "unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). To determine whether an official is entitled to qualified immunity, the Court asks (1) "whether a constitutional violation occurred" and (2) "whether the right violated was clearly established" at the time of the alleged violation under then-prevailing circuit law. *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Under the second prong, "[w]hat matters is that it would be clear to a reasonable officer that his or her conduct was unlawful in the particular situation that he or she confronted." *Livingston v. Kehagias*, 803 F. App'x 673 (4th Cir. 2020) (citations omitted). In evaluating a claim of qualified immunity at the summary judgment stage, the Court views the facts and inferences drawn from those facts in the light most favorable to the nonmovant. *See Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016).

### 1. *Unlawful Seizure*

Starting with the unlawful seizure claim, Officer McKoy is entitled to qualified immunity because he, Officer Routhier, and the EMTs on the scene made specific observations that led them to credit Mrs. White's report and believe that Mr. White was suffering from a mental disorder that rendered him a danger to his family. It is well established that the Fourth Amendment prohibits "random or baseless detention of citizens for psychological evaluations." *Gooden v. Howard City, Maryland*, 954 F.2d 960, 968 (4th Cir. 1992). As such, to lawfully undertake a mental health

seizure, "an officer must have probable cause to believe that the individual posed a danger to [him]self or others." *S.P. v. City of Takoma Park*, 134 F.3d 260, 266 (4th Cir. 1998). Though the Fourth Circuit has noted the "lack of clarity" in the law governing mental health seizures, it has explained that "officers have probable cause to seize a person for a psychological evaluation when 'the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man' to believe that the person poses a danger to himself or others." *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

The Fourth Circuit has repeatedly emphasized that a core component of the probable cause inquiry in the mental health seizure context is the presence or absence of an independent investigation by law enforcement. The Fourth Circuit's decisions in *Bailey v. Kennedy*, 349 F.3d 731 (4th Cir. 2003) and *S.P. v. City of Takoma Park*, 134 F.3d 260, are particularly instructive. Both cases involved challenges to police officers' decisions to seize a plaintiff based on a third-party's report that the plaintiff was suicidal. In *Bailey*, the Fourth Circuit held that the officers were not entitled to qualified immunity in relation to the seizure, since the facts on summary judgment indicated that the officers' own observations provided no evidence supporting the third-party's claim that the plaintiff intended to harm himself. In *City of Takoma Park*, by contrast, the Fourth Circuit held "as a matter of law that the officers had probable cause to believe that there was a clear and imminent danger" justifying a seizure, because when the officers interviewed the plaintiff, she made certain concerning comments to the effect that she wished she could disappear, and "the officers perceived [her] to be evasive and uncooperative." 134 F.3d at 268, 273. In subsequent cases, the Fourth Circuit has built upon this framework and continued to focus on the issue of whether officials' own observations provide independent verification for a third-party's

report.  *See, e.g.*, *Raub v. Campbell*, 785 F.3d 876 (4th Cir. 2015) (granting qualified immunity to mental health professional whose commitment decision was based on own observations); *Cloaninger*, 555 F.3d at 333 (granting qualified immunity because "defendants had much more information available to them than the mere 911 call in *Bailey*").

Here, it is uncontested that White's wife reported to Officer McKoy: (1) that White was acting erratically and had been making highly concerning statements regarding the imminent end of the world and deaths of his family members; (2) that she believed PCP use was a cause of his unusual behavior; and (3) that she was concerned that in his distressed state, he represented a danger to her children.  Likewise, it is undisputed that unlike the neighbor in *Bailey*, Mrs. White knew her husband well and was at the White residence to speak with the police in person when they arrived.  Additionally, it is uncontested that Officer McKoy, Officer Routhier, and two EMTs personally interviewed White before the police attempted to seize him.  Each officer and EMT reports perceiving worrying symptoms indicative of severe psychological distress and PCP use.  And importantly, though White disputes the accuracy of the officers' and EMTs' perception that he was sweating profusely, failing to answer questions, and otherwise displaying symptoms associated with PCP use, his affidavit *does not* dispute that they observed him making highly concerning statements regarding the impending end of the world and deaths of members of the White household.  Viewing the facts in the light most favorable to White and accepting that he was not actually sweating profusely or exhibiting symptoms of PCP use, the combination of his wife's report and his own statements to the officers and EMTs still make this factual scenario much more akin to *City of Takoma Park* than *Bailey*.  A reasonable police officer in Officer McKoy's position would have believed he had probable cause to affect a seizure.

In his opposition, White raises a legal challenge to the applicability of the statute upon which Officer McKoy relied for authority to affect the seizure. Officer McKoy seized White pursuant to Md. Code Ann., Health-Gen § 10-622, which authorizes a peace officer to bring an individual for an emergency evaluation if the officer has "reason to believe that the individual: (1) [h]as a mental disorder; and (2) [p]resents a danger to the life or safety of the individual or of others." White argues that because Officer McKoy believed his concerning behavior may have been a result of PCP use, Officer McKoy cannot have believed he had a "mental disorder" under the statute. At the core of White's argument is the legal theory that a mental disorder must be caused by "internal stimuli," as opposed to "intoxication." (Opp'n Mot. to Dismiss at 11).

The problem with White's argument is that he does not cite any on-point authority in support of his interpretation of the term "mental disorder," and neither the text of the statute nor the Maryland caselaw appears to support his theory. The "emergency evaluations" statute itself simply defines "mental disorder" to mean:

> behavioral or other symptoms that indicate: (i) To a lay petitioner who is submitting an emergency petition, a clear disturbance in the mental functioning of another individual; and (ii) To [a health professional] at least one mental disorder that is described in [the] American Psychiatric Association's "Diagnostic and Statistical Manual--Mental Disorders[.]"

Md. Code Ann., Health-Gen § 10-620.[4] This definition does not clearly imply the distinction between internally and externally caused disturbances in mental functioning advocated by White. Further, Maryland Courts interpreting § 10-622 have treated "substance-induced psychosis" caused by PCP use as a mental disorder. *See J.H. v. Prince George's Hosp. Ctr.*, 165 A.3d 664, 672 (Md. Ct. Spec. App. 2017). Accordingly, a reasonable officer in Officer McKoy's position

---

[4] White effectively ignores this definition, focusing instead on the generally applicable definition of "mental disorder" in Md. Code Ann., Health-Gen. § 10-101. But Section 10-620 clearly establishes that the term "mental disorder" has a specific meaning in the context of emergency evaluations, and at any rate, the definition in Section 10-101 does not clearly exclude substance-induced mental disturbances either.

would have no cause to believe that the source of White's apparent mental disturbance would affect his authority to seize White for evaluation.

The Court notes that, construing the facts in Mr. White's favor, there is substantial evidence that Mrs. White, the officers, and the EMTs were wrong to think Mr. White was suffering from a mental disorder and posed a threat to his family. It is undisputed that Mr. White tested negative for PCP and was cleared to leave the Meritus Medical Center the morning after the events at issue. The Court also acknowledges the real possibility that, primed by Mrs. White's report, the officers and EMTs on the scene misinterpreted behaviors attributable to Mr. White's fear at being surrounded by police as signs of a dangerous mental break, and misunderstood the import of White's statement's regarding the end of the world. However, the Fourth Circuit has been very clear that even an officer who makes a mistake regarding the necessity of a mental health seizure is entitled to qualified immunity so long as a reasonable officer would believe the seizure necessary. *See Gooden*, 954 F.2d at 966 (granting qualified immunity even though it was agreed "that the officers made a mistake" in believing the plaintiff was suffering from a mental disorder). Thus, Officer McKoy is entitled to summary judgment on qualified immunity grounds.

### 2. *Excessive Force*

Likewise, Officer McKoy is entitled to qualified immunity on the excessive force claim. While White has presented evidence that Officer Filges used excessive force, he has not presented evidence supporting a finding that Officer McKoy did so as well.

"The Fourth Amendment's bar on unreasonable seizures prohibits the use of excessive force by a police officer in effectuating an arrest." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). "Whether a use of force is excessive is an objective inquiry, based on . . . 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Livingston*, 803 F. App'x 673 (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)). "The extent of the plaintiff's injury is also a relevant consideration." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).

Taking into account the above factors, the circumstances called for sufficient force to enable the officers to complete their seizure without risking undue harm to White.  White has not been accused of any crime, which militates against the use of force.  *See Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 901 (4th Cir. 2016) (Where no criminal conduct is suspected, and the justification for the seizure "is preventing harm to the subject of the seizure, the government has little interest in using force to effect that seizure.").  Likewise, there is nothing in the record to indicate that White had weapons in the house, or that he threatened the police.  However, White did resist the officers' attempt to seize him by straightening his arms, then keeping his arms under his body.  Undisputedly, White is also a large and strong man, whom the officers struggled to control.  Additionally, Officer McKoy believed, based on Mrs. White's report and his own observations, that White did pose some danger to himself and his family.

Weighing Officer McKoy's conduct against these factors and construing the facts in the light most favorable to White, Officer McKoy's use of force was reasonable under the circumstances.  After determining that White needed to be seized for an evaluation and failing to convince White to voluntarily accompany the EMTs, Officers McKoy and Routhier attempted to pull White out of his chair and bring his arm behind his back.  When White pulled his arms away, Officer McKoy and Officer Routhier pulled White to the ground by his arms and pants.  The officers then attempted to pull White's hands behind his back for some time, but were unable to do so until Officer Filges tasered White.  There is no allegation that Officer McKoy himself struck

White, tasered him, or took aggressive measures beyond attempting to gain control over White's hands.  Importantly, there is also no allegation that Officer McKoy caused White any physical injury.  *C.f. Jones v. Ashford*, Civ. No. TDC-14-3639, 2017 WL 221783, at *6 (D. Md. Jan. 18, 2017) (noting lack of injury weighs against a finding of excessive force and compiling cases), *aff'd*, 691 F. App'x 113 (4th Cir. 2017).  Given these facts, Officer McKoy is entitled to qualified immunity on the excessive force claim.  *C.f. Estate of Armstrong*, 810 F.3d 892 (granting qualified immunity to officers who used much more force to overcome nonviolent resistance to a mental health seizure).

### C.  Claims Against the City of Hagerstown

Summary judgment will be denied as to White's excessive force claim against the City of Hagerstown.  White has provided evidence supporting a finding that Officer Filges violated his rights by tasering him, and that the City's policies caused Officer Filges to do so.

Under *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), to establish a 42 U.S.C. § 1983 claim against a municipality, a plaintiff must both prove that an agent of the municipality violated their rights, "and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights."  *Jordan by Jordan v. Jackson,* 15 F.3d 333, 338 (4th Cir. 1994).  A culpable policy, practice, or custom can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (alterations in original) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)).

Construing the facts in the light most favorable to White, he has provided sufficient evidence on both prongs of the *Monell* inquiry to support a finding in his favor.  Starting with the first prong, White has provided sufficient evidence to establish that Officer Filges did indeed violate his rights by twice using his taser on White.  The Fourth Circuit's decision in *Estate of Armstrong*, 810 F.3d 892, is instructive.  In that case, the Fourth Circuit found the use of a taser in the course of a lawful mental health seizure to constitute excessive force, even though the seized individual was non-violently resisting by "clinging to a post."  *Id.* at 901.  The Fourth Circuit concluded "that taser use is unreasonable force in response to resistance that does not raise a risk of immediate danger."  *Id.* at 905.  Construing the facts in White's favor for the purposes of summary judgment, the record shows that Officer Filges tasered him while he was nonviolently resisting arrest and did not pose an immediate danger to anyone.  Therefore, White has provided sufficient evidence to establish that an agent of the City violated his rights.

The closer question is whether White has provided sufficient evidence of the necessary "direct causal link between a municipal policy or custom" and Officer Filges' allegedly unlawful action.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).  White claims Officer Filges' use of his taser was consistent with and caused by official Hagerstown Police Department policies, including its "Less Lethal Weapons" and "Use of Force" policies.  (Am. Compl. ¶¶ 86–92.)  These policies appear to have authorized the use of tasers on individuals who are "actively resisting" by "maintaining a posture of noncompliance" or "stiffening [their] arms."  (Use of Force Policy at 2–3, Compl. Ex. 4, ECF No. 1-5.)  These policies also authorized taser use to "control persons whose attempt to prevent a lawful arrest or custody puts officers and themselves at risk of physical injury."  (Less Lethal Force Policy at 3–5, Compl. Ex. 2, ECF No. 1-3.)  White argues that these policies could have caused Officer Filges to unlawfully use his taser on White.  White also

identifies three other incidents in which HPD officers allegedly used "less lethal weapons," including tasers, in a manner that was allegedly consistent with the aforementioned policies but also allegedly constituted excessive force.  (Am. Compl. ¶¶ 93–97.)

Defendants' briefing does not address the sufficiency of White's evidence regarding causation.  Instead, Defendants argue that the policies at issue are not inconsistent with the Fourth Circuit case law on taser use predating October 17, 2015.  This argument is inapposite, since "[u]nlike public officials, municipalities do not enjoy qualified immunity [and as such,] claims against municipalities are measured against current law, without regard to whether municipalities' obligations were clearly established at the time of the alleged violations." *Owens*, 767 F.3d at 402 (citing *Owen v. City of Independence,* 445 U.S. 622 (1980)).  Therefore, the question is whether the Use of Force and Less Lethal Force policies caused Officer Filges to use excessive force, not whether those policies were facially unconstitutional in 2015.

As the movant, it is the City's burden to show that it is "entitled to judgment as a matter of law" under Rule 56.  Given the strength of White's evidence of a violation and the City's failure to argue the causation issue, pre-discovery summary judgment on the *Monell* claim is unwarranted.

## IV.    *Conclusion*

For the foregoing reasons, an order shall enter denying White's motion for leave to file a sur-reply, granting Defendants' motion to supplement, granting summary judgment to Officers Filges, Routhier, and McKoy, denying summary judgment to the City of Hagerstown, and denying Defendants' request for bifurcation as moot.

DATED this 5th day of June, 2020.

BY THE COURT:

_____/s/_____

James K. Bredar
Chief Judge